**Mary D. POLLARD, Plaintiff–Appellant,**

v.

**HIGH'S OF BALTIMORE, INCORPORATED, Defendant–Appellee.**

No. 01–1342.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 29, 2001.

Decided Feb. 25, 2002.

**ARGUED:** Paul Francis Evelius, Wright, Constable & Skeen, L.L.P., Baltimore, Maryland, for Appellant. Christopher Mark Feldenzer, Law Offices of Norman R. Buchsbaum, Baltimore, Maryland, for Appellee. **ON BRIEF:** Norman R. Buchsbaum, Law Offices of Norman R. Buchsbaum, Baltimore, Maryland, for Appellee.

Before WILKINSON, Chief Judge, GREGORY, Circuit Judge, and MALCOLM J. HOWARD, United States District Judge for the Eastern District of North Carolina, sitting by designation.

Affirmed by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge GREGORY and Judge HOWARD joined.

## OPINION

WILKINSON, Chief Judge.

Plaintiff Mary Pollard claims that defendant High's of Baltimore, Inc. violated her rights under the Americans with Disabilities Act ("ADA") by failing to accommodate her disability and by constructively discharging her. Pollard also claims that she was wrongfully discharged under Maryland law. The district court granted summary judgment to High's. Because Pollard's impairment during her recovery from back surgery was a temporary one not covered by the ADA, and because High's did not wrongfully discharge her, we affirm the judgment of the district court.

I.

Plaintiff Mary Pollard was an Area Supervisor for defendant High's of Baltimore, Inc., which operates a chain of convenience stores. Pollard began working for High's in 1985 as a store clerk and was eventually promoted to the Area Supervisor position. Area Supervisors are responsible for monitoring ten to fifteen stores. This requires spending considerable time driving from store to store within an assigned area and occasionally filling in for clerks when clerks and/or managers are unable to work. Area Supervisors must be on call twenty-four hours a day in case of emergencies and typically work more than forty hours per week.

In August 1997, Pollard injured her back while working as an Area Supervisor. After a brief absence from work, she returned to her job until December 1997. At that time, Pollard was informed by her personal physician, Dr. Brager, that she would need back surgery. She had that surgery in January 1998 and also filed a claim with the Maryland Workers' Compensation Commission. Because of complications from the surgery, she was not cleared to return to work until April 1998.

In April 1998, Dr. Brager determined that Pollard could work with the following restrictions: Pollard was limited to working eight hour days, was prohibited from doing any repetitive bending or any lifting of more than five pounds, and was prohibited from driving for extended periods of time. When she informed High's of these

conditions, High's told Pollard that it did not have "light-duty" for supervisors and that she could not yet return to work.

During her recovery and attempts to return to work, Pollard continued to deal with High's workers' compensation insurance carrier and rehabilitation specialists retained by the insurer. From May until June 1998, Pollard participated in a "work-hardening" program with a physical therapist and consulted with vocational therapists provided by the insurer. In June 1998, Dr. Rosenthal, who monitored Pollard's progress for the insurer, concluded that Pollard could return to work as an Area Supervisor with restrictions.

On August 25, 1998, Pollard contacted High's directly and informed her District Manager, Patricia Kelly, that she was ready to return to work. Shortly thereafter, a vocational therapist called Pollard to arrange a meeting between himself, Pollard, and Dr. Brager. During this meeting on September 4, 1998, Dr. Brager reduced the work restrictions he had imposed on Pollard in April as follows: Pollard was still prohibited from working more than eight hours a day and from bending repetitively, but the restriction on lifting was changed to no more than twenty-five pounds, and Pollard was now permitted to drive for extended periods.

On September 18, Pollard, the vocational therapist, Kelly, and High's Operation Manager, Timothy Sheehan, met to discuss Pollard's return to work. Everyone at the meeting acknowledges that they discussed the ways in which Dr. Brager's restrictions on heavy lifting and repetitive bending could be implemented. The parties agreed that Pollard could use the assistance of her coworkers and subordinates to handle the more physically demanding tasks she would be required to perform. However, the parties dispute what plan of action

regarding Pollard's return to work eventually resulted from this discussion.

Pollard contends that in light of Dr. Brager's eight hour work restriction, Sheehan insisted that High's would not permit her to work as a "part-time" Area Supervisor. Therefore, it was proposed that Pollard begin working as a store clerk. Pollard claims she had no choice but to work first as a store clerk because she was convinced it was the only way she would be permitted to return to her position as an Area Supervisor. High's, however, contends that Pollard offered to work as a store clerk. According to High's, this arrangement was implemented to allow Pollard to regain her strength until she could resume her duties as an Area Supervisor.

Regardless of whose suggestion it was, Pollard returned to work, as a clerk, on September 23, 1998. She was paid $5.60 an hour, or approximately $12,000 a year, while working as a clerk, compared to the $40,000 a year she earned as an Area Supervisor. There is some confusion about how the issue of Pollard's pay was to be handled since she was receiving workers' compensation income. High's contends that it believed the insurer would continue to pay partial benefits so that Pollard's net income would not be reduced, but High's does not dispute that during the time Pollard worked as a clerk she was not paid this difference. And while Pollard contends that High's should have known she was not being paid the difference, there is no record that Pollard formally complained to any High's official about her compensation.

Despite the modifications in the store clerk position to accommodate her restriction on heavy lifting and repetitive bending, Pollard found the physical demands of working as a clerk unbearable. Pollard experienced such pain that she rarely, if ever, completed any of the eight hour

shifts she had been assigned. Yet, on September 29, 1998, when Dr. Brager lifted her eight hour work restriction, Pollard reported this to Sheehan and expected to be returned to her Area Supervisor position. Sheehan, however, insisted that Pollard had to demonstrate that she could work an eight hour day as a store clerk before she could return to her Area Supervisor position. Pollard continued to work as a clerk for approximately one more month before quitting on October 29, 1998. When she quit, Pollard informed High's that she had obtained employment elsewhere. And Pollard did, in fact, obtain immediate reemployment at a car dealership.

On November 12, 1999, Pollard brought this suit, alleging, *inter alia*, that High's violated her rights under the ADA by failing to accommodate her disability and constructively discharging her. Pollard also brought an action under Maryland law claiming wrongful termination. The district court granted summary judgment for High's on November 21, 2000. The district court held that, as a matter of law, Pollard was "not entitled to disability discrimination protection because she cannot satisfy the ADA definition of a qualified individual with a disability.'" The court concluded that there was "no evidence that the physical limitations arising from [Pollard's] back injury were severely limiting." The court also found that her immediate reemployment elsewhere showed she was not " 'substantially limited' in her ability to work" and that High's did not regard Pollard as disabled. Finally, the court determined that Pollard's state law claim for wrongful discharge also failed as a matter of law because she had "not proffered evidence to create a factual issue as to wheth-er her working conditions were purposefully made so intolerable that she was forced to quit." Pollard appeals.

## II.

### A.

We begin by considering Pollard's ADA claim. The ADA prohibits discrimination by a covered entity, including a private employer such as High's, "against a qualified individual with a disability." *See* 42 U.S.C. §§ 12111(2), 12112(a). Therefore, in order to come within the ADA's protected class, a plaintiff must first show that she is disabled within the meaning of the Act. The ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Pollard's principal assertion is that she is substantially limited in, *inter alia*, the major life activity of working under § 12102(2)(A). Pollard asserts, and High's does not dispute, that her back injury is a physical impairment and that working is a major life activity.[1] Therefore, whether Pollard is "disabled" turns on whether her back injury is substantially limiting.

In order to demonstrate that an impairment is substantially limiting, an individual must show that she is significantly restricted in a major life activity. *See, e.g., Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 199 (4th Cir.1997); 29 C.F.R. § 1630.2(j)(1). And in determining whether an impairment is substantially limiting, courts may consider the "nature and se-

---

1. The Supreme Court has noted "the conceptual difficulties inherent in the argument that working could be a major life activity," but declined to "decide this difficult question." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, ——, 122 S.Ct. 681, 692, 151 L.Ed.2d 615 (2002). This question is likewise not necessary to the resolution of this case.

verity of the impairment," the "duration or expected duration of the impairment," and the "permanent or long term impact" of the impairment. 29 C.F.R. § 1630.2(j)(2).[2] These factors indicate that a temporary impairment, such as recuperation from surgery, will generally not qualify as a disability under the ADA. *See, e.g.*, 29 C.F.R. § 1630.2(j), app. at 353. An impairment simply cannot be a substantial limitation on a major life activity if it is expected to improve in a relatively short period of time.

The Supreme Court's unanimous opinion in *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), supports this conclusion. In *Toyota*, the Court stated that the ADA's "substantially limits" requirement indicates that an impairment must interfere with a major life activity " 'considerabl[y]' or 'to a large degree.' " 534 U.S. at ——, 122 S.Ct. at 691. And the Court stressed that an "impairment's impact must also be permanent or long-term." *Id.* The Court's earlier opinion in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), further suggests that temporary impairments will typically not allow an individual to claim relief under the ADA. In *Sutton*, the Court held that corrective measures must be taken into account when evaluating an individual's impairment. 527 U.S. at 482, 488–89, 119 S.Ct. 2139. If an individual's ability to correct an impairment must be considered, it seems clear that the individual's likelihood of recovery from a temporary impairment must also be considered.

■ Prior precedent of this court likewise indicates that temporary impairments usually do not fall within the ADA's definition of "disability." In *Halperin*, we stressed that "it is evident that the term 'disability' does not include temporary medical conditions, even if those conditions require extended leaves of absence from work." 128 F.3d at 199 (internal citations omitted). And several of our sister circuits have taken a similar approach with respect to temporary impairments under the Act. *See, e.g.*, *Gutridge v. Clure*, 153 F.3d 898, 901–02 (8th Cir.1998) (holding that plaintiff's inability to work while recovering from wrist and elbow surgery did not qualify as a disability under the ADA and noting that "the ADA requires permanent or long-term impairments"); *Heintzelman v. Runyon*, 120 F.3d 143, 144–45 (8th Cir.1997) (same with regard to a temporary back injury); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir.1996) (same with regard to recovery from ankle injury and surgery); *McDonald v. Pennsylvania*, 62 F.3d 92, 95–96 (3d Cir.1995) (same with regard to recuperation from abdominal surgery); *Evans v. City of Dallas*, 861 F.2d 846, 852–53 (5th Cir.1988) (same under the Rehabilitation Act of 1973 with respect to inability to work due to knee surgery).

■ However, while the presumption exists that temporary impairments do not qualify as disabilities under the ADA, temporary conditions still require a case-by-case evaluation under the Act. *See, e.g.*, *Toyota*, 534 U.S. at ——, 122 S.Ct. at 692; *Sutton*, 527 U.S. at 483, 119 S.Ct. 2139; *Ennis v. Nat'l Ass'n of Bus. & Educ.*

---

2. The persuasive authority of the Equal Employment Opportunity Commission ("EEOC") regulations interpreting the ADA is unclear, and the issue has explicitly been left open by the Supreme Court. *See, e.g., Toyota*, 534 U.S. at —— ——, 122 S.Ct. at 689–90; *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 480,

119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). However, because both parties accept the EEOC regulations, and determining their validity is not necessary to decide this case, we have no occasion to determine what level of deference they are due.

*Radio, Inc.*, 53 F.3d 55, 59–60 (4th Cir. 1995). Temporary disabilities present a spectrum of cases and at some point the duration of an impairment could be so long that it cannot properly be characterized as temporary. We must therefore examine how severe Pollard's particular impairment was, how long her impairment was expected to last, and how likely it was that her impairment would be ameliorated over time.

### B.

■ The undisputed evidence in this case demonstrates that Pollard suffered a back injury in August 1997, eventually had to undergo surgery in January 1998, and, due to an infection, had to take a leave of absence from work until September 1998. However, this nine-month absence is insufficient to demonstrate that Pollard had a permanent or long-term impairment that significantly restricted a major life activity. First, nothing in the nature or severity of Pollard's impairment indicated that she had anything other than a temporary impairment.

■ Recovering from surgery can frequently take several months. And this is especially likely when there are complications, such as an infection. But physical impairments while recuperating from surgery are not evidence of a permanent disability. *See, e.g., Gutridge*, 153 F.3d at 901–02. Therefore, nothing in the nature of Pollard's condition during the time she worked for High's suggested that she had a permanent impairment or that she was not likely to make a full recovery.

■ Second, there is no evidence that Pollard's impairment was expected to be permanent or long-term during the relevant time period in 1998. In fact, communications to High's from Pollard and her personal physician, Dr. Brager, indicated

that her condition was thought to be only temporary and that Pollard would soon be able to resume her full duties as an Area Supervisor. Doctors' evaluations, which indicate that an individual's impairment is improving, are persuasive evidence that the impairment is expected to be only temporary. *See, e.g., Mellon v. Fed. Express Corp.*, 239 F.3d 954, 956–57 (8th Cir.2001); *Heintzelman*, 120 F.3d at 145.

Dr. Brager's contemporaneous treatment notes and his orders based on these notes explained that Pollard was expected to make a full recovery. Brager's notes documented Pollard's improvement and progressively removed her work restrictions. For example, Dr. Brager's August 18, 1998 note stated that "overall [Pollard] is doing reasonably well." Brager went on to explain:

> I feel that there is a good chance that after an initial "break in" that she will be able to get back to the kind of work that she had done in the past. However, it is not reasonable for us to expect that she will be able to jump right back in to fourteen hour days and lifting heavy items on a repetitive basis. It is my recommendation that the patient go back to work at no more than eight hours per day with no lifting greater than 15 to 20 pounds and no repetitive bending.

Two weeks later, on September 4, 1998, Brager wrote another note, indicating that Pollard was improving and removing some of his prior restrictions on her activities. He wrote:

> Patient is doing quite well with normal activities of daily living. She is spending more time in and out of her car.

> Overall, I think there is no question that she is now ready to go back to work at eight hours per day, and I think that we can even increase her lifting limit to 25

pounds. I still do not want her to do repetitive bending.

Brager also stated that he would see Pollard again in several weeks to reevaluate her "for further return to normal duties at work."

On September 29, 1998, several days after Pollard's return to work as a store clerk, Brager wrote a third progress note again explaining that Pollard continued to improve. Brager wrote that she had a "normal gait with good mobility throughout." And he removed Pollard's eight hour work restriction, stating, "I feel at this time [Pollard] is ready to return to her regular work, unlimited hours, with the only restriction being that she not lift more than 25 pounds or that she not bend on a repetitive basis."

In addition to the information Brager provided to High's, Dr. Rosenthal, who monitored Pollard's condition for the workers' compensation insurer, also reported Pollard's progressive improvement over time. Rosenthal rendered an early opinion in February 1998, shortly after Pollard's surgery, indicating that he had doubts about her ability to return to work. However, Rosenthal modified his opinion as he followed Pollard's recovery. On June 26, 1998, after examining Pollard, he stated that "Pollard is doing quite well." He explained: "I believe that she can return to work as an area supervisor at the present time; however, she will have some slight restrictions." Rosenthal concluded

by stating, "I believe that with time her symptoms will continue to improve and it is likely that in several months she may improve enough to actually return to full duty at work." On July 22, 1998, after watching a videotape of Pollard doing various activities, Rosenthal reaffirmed his conclusion that Pollard was improving.

■ Additionally, Pollard repeatedly communicated to High's that she was ready and able to return to full-time duty as an Area Supervisor. And Pollard has admitted that, during her employment with High's, neither she nor any of her treating physicians or attorneys ever communicated to any High's official that her physical impairment was permanent. As the district court correctly noted, they could not have done so because there was no medical evidence at that time to support a conclusion that Pollard's condition was long-term or permanent.[3]

Pollard contends that nothing in her doctors' reports specifically stated that her impairment was temporary, and that Brager never lifted all of her work restrictions, indicating that she had a permanent or long-term impairment. We are unpersuaded. In the end, Pollard was left with only the restrictions that she not lift more than twenty-five pounds or bend repetitively. These mild limitations are not significantly restricting. And we have consistently held that similar restrictions are not evidence of a permanent impairment that substantially limits any major life activity

3. However, on July 14, 2000, Dr. Brager changed his original opinion and determined that Pollard was permanently disabled and had been since January 1998. Contrary to Pollard's assertion, Dr. Brager's revised opinion and the opinions of her hired vocational experts, based on that 2000 report, do not affect our analysis under the ADA because "the date of an adverse employment decision is the relevant date for determining whether a plaintiff is a 'qualified individual with a dis-

ability.'" *EEOC v. Stowe–Pharr Mills, Inc.,* 216 F.3d 373, 379 (4th Cir.2000); *see also Griffith v. Wal-Mart Stores, Inc.,* 135 F.3d 376, 380 (6th Cir.1998). And as the district court noted, there does not appear to be any "authority in the case law interpreting the ADA to allow a medical practitioner's *nunc pro tunc* opinion to contradict his own contemporaneous opinion concerning a patient's disability in order to shore up a discrimination claim."

under the ADA. *See, e.g., Halperin,* 128 F.3d at 200; *Williams v. Channel Master Satellite Sys., Inc.,* 101 F.3d 346, 349 (4th Cir.1996).

Pollard also seems to claim that because High's observed that she could not perform the modified duties of a store clerk for eight hours, High's should have recognized that she had a permanent impairment, or at a minimum, an impairment of an indefinite duration. However, in the same breath, Pollard argues that High's should have allowed her to return to her position as an Area Supervisor. This indicates that she felt capable of performing an Area Supervisor's duties, which indisputably include filling in for store clerks. All that Pollard's inability to complete her shift as a store clerk indicated was that, consistent with both the contemporaneous medical reports and Pollard's

own statements, Pollard needed a longer break-in period. It did not indicate that her impairment was permanent.[4]

■■■■ Furthermore, Pollard immediately took a job with a car dealership when she left High's. This reinforces our conclusion that Pollard was not substantially limited in the major life activity of working. In order to be substantially limited in the major life activity of working, "one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton,* 527 U.S. at 491–92, 119 S.Ct. 2139. An individual must demonstrate that she is unable to work in a broad range of jobs. *Id.; see also* 29 C.F.R. § 1630.2(j)(3)(i). And obtaining a new job is evidence that an impairment is not substantially limiting. *See, e.g., Halperin,* 128 F.3d at 200; *Heintzelman,* 120 F.3d at 145. As the district court noted, Pollard's immediate reemployment elsewhere belies the assertion that she was "disabled" within the ADA's definition or that her impairment was anything other than temporary during the time of her employment at High's.[5]

■■■■ Of course, an impairment that is not substantially limiting under the ADA definition of "disability" can still be a source of understandable concern for the individual affected. We do not make light of Pollard's surgery or the period of recuperation that followed it. However, apply-

---

**4.** Pollard claims that she has produced evidence indicating that High's knew that she was permanently disabled in 1998. However, this evidence consists solely of a single handwritten note by Pollard's vocational therapist regarding a conversation he had with Sheehan about Pollard's performance as a store clerk. In that conversation, Sheehan allegedly said that he was "not optimistic" about Pollard's improvement. This isolated statement is insufficient to contradict the overwhelming evidence from Pollard's doctors and Pollard herself that her condition was improving and was only temporary.

**5.** Pollard also claims that High's regarded her as having an impairment that substantially limited her in the major life activity of working. *See* 42 U.S.C. § 12102(2)(C). In order to demonstrate that High's regarded her as disabled, Pollard must show that High's entertained a misperception about her condi-

tion. She must show that High's mistakenly believed her to have either a substantially limiting impairment that she did not have, or a substantially limiting impairment when, in fact, her impairment was nonlimiting. *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139; *see also Haulbrook v. Michelin N. Am., Inc.,* 252 F.3d 696, 703 (4th Cir.2001). Pollard has failed to present evidence to indicate that High's regarded her as disabled. High's would not allow Pollard to resume her Area Supervisor position until she demonstrated that she could work eight hours or more. But, as previously discussed, this was not done based on a faulty perception that she would never return to that position. As the district court noted, the evidence indicates that High's believed Pollard's "work limitations were temporary and that she would eventually, if not soon, return to her former duties."

ing the protections of the ADA to temporary impairments, such as Pollard's, would dramatically expand the scope of the Act. *See, e.g., Halperin,* 128 F.3d at 200. Congressional findings, enacted as part of the ADA, require the conclusion that Congress did not intend for the Act's protections to extend to individuals with temporary impairments. Congress found that "some 43,000,000 Americans have one or more physical or mental disabilities." 42 U.S.C. § 12101(a)(1). If Congress had intended temporary disabilities to be covered by the Act, this number undoubtedly would have been much higher. *Cf. Toyota,* 534 U.S. at ——, 122 S.Ct. at 691 (drawing same conclusion with respect to extending the ADA to individuals with impairments that preclude the performance of "some isolated, unimportant, or particularly difficult manual task"); *Sutton,* 527 U.S. at 484–87, 119 S.Ct. 2139 (drawing same conclusion with respect to extending the ADA to individuals with correctable physical limitations). Federal courts are simply not in the position to extend the ADA without a directive from Congress, and we decline to do so in this case.

### III.

■■■ We next turn to Pollard's state law claim that she was wrongfully terminated in retaliation for filing a workers' compensation claim.[6] *See Adler v. Am. Standard Corp.,* 291 Md. 31, 432 A.2d 464, 473 (1981); Md.Code Ann. Lab. & Empl. § 9–1105. In order to establish this claim, Pollard must show that she was discharged in the first place. Ordinarily, an employee who resigns would not have a right of action for abusive discharge. *Beye v. Bureau of Nat'l Affairs,* 59 Md. App. 642, 477 A.2d 1197, 1201 (Ct.

Spec.App.1984). However, it is sometimes necessary "to discard form for substance" and the law therefore recognizes the concept of "constructive discharge." *Id.* Under Maryland law, the standard for measuring whether a resignation is actually a constructive discharge is "whether the employer has deliberately caused or allowed the employee's working conditions to become so intolerable that a reasonable person in the employee's place would have felt compelled to resign." *Id.* at 1203. By using strong words such as "deliberately," "intolerable," and "compelled," Maryland courts, like those in most states, have set a high standard for constructive discharge claims.

■■■ Pollard cannot meet this high threshold. And High's simply cannot be said to have rendered Pollard's working conditions intolerable. High's honored Pollard's request to return to work. And it was hardly remiss of an employer to ease an employee's return to the workplace after that employee had undergone back surgery. It is undisputed that the Area Supervisor position Pollard wanted involved long hours, often in excess of forty hours per week, extensive driving between stores, and supervisory pressure in addition to physical labor and occasionally filling in as a clerk. Pollard admits that she rarely, if ever, was able to work more than five or six hours in a modified store clerk position, so High's was justified in its conclusion that she was not yet ready to return to her Area Supervisor position and that she needed a longer break-in period. If providing such a temporary break-in period were impermissible, the law would be creating perverse incentives for employers to force recuperating employees into positions prematurely, leading

---

**6.** Pollard also makes a claim for constructive discharge under the ADA, but because we determined that Pollard was not disabled within the meaning of the Act, we need not review this claim.

potentially to additional liability for the employer and, most unfortunately, to considerable pain and relapses for the employee.

Moreover, the conditions under which Pollard returned were hardly intolerable. To the contrary, as the district court noted:

> [Pollard] acknowledges that each time she informed Sheehan of her need to depart early for the day because of discomfort caused by her back, he never imposed upon her any condition that she remain at work or suffer adverse consequences. She does not assert she was denied the assistance of her co-workers to implement the lifting and bending restrictions imposed by Dr. Brager.

Pollard's reduction in salary when she returned to work as a store clerk does not reveal a deliberate attempt by High's to make Pollard's working conditions intolerable. While there is some dispute about how her pay was going to be handled during this interim period, there is no dispute that High's believed its workers' compensation insurance carrier was going to pay Pollard the difference between her store clerk and Area Supervisor salaries. And although Pollard alleges that High's should have known that there were problems relating to her pay, there is no record that Pollard made a formal complaint about not receiving the workers' compensation benefits. Instead, Pollard quit and took a position with a car dealership.

■ In allowing Pollard to return to work initially as a clerk for a limited period each day, High's actions paralleled, in substance, the recommendations of Pollard's doctors that she return to work with restrictions that would be modified over time. The law does not require a company to insist that an employee perform immediately at pre-surgery levels. The hazards of such a course are obvious, and High's acted responsibly in not subjecting Pollard to them.[7]

### IV.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED.*

---

7. Even if Pollard could proffer enough evidence to show a constructive discharge, she fails to show a causal nexus between her alleged constructive discharge and the filing of her workers' compensation claim as required by *Adler*. Pollard claims that Sheehan twice made negative comments about the fact that she had hired a disability lawyer and that these comments are enough to evidence retaliatory animus. However, Sheehan's two brief, off-hand comments about Pollard's particular attorney made seven months apart do not evidence retaliatory animus for filing a workers' compensation claim.