UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

THOMAS PALOTAI,

     *Plaintiff-Appellant,*

v.

UNIVERSITY OF MARYLAND AT
COLLEGE PARK; HENRY MITYGA;
LAURIE HELLMAN-AKER,

     *Defendants-Appellees.*

No. 01-1147

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-00-742-PJM)

Argued: April 4, 2002

Decided: June 27, 2002

Before MICHAEL and MOTZ, Circuit Judges, and
Walter K. STAPLETON, Senior Circuit Judge of the
United States Court of Appeals for the Third Circuit,
sitting by designation.

Affirmed by unpublished opinion. Senior Judge Stapleton wrote the
opinion, in which Judge Michael and Judge Motz joined.

## COUNSEL

**ARGUED:** Olge Csaky Schaut, LAW OFFICE OF OLGE SCHAUT,
Arlington, Virginia, for Appellant. Thomas Faulk, Assistant Attorney

General, Baltimore, Maryland, for Appellees. **ON BRIEF:** Philip B. Zipin, GAGLIARDO & ZIPIN, Silver Spring, Maryland, for Appellant. J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, Maryland, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

STAPLETON, Senior Circuit Judge:

Appellant Thomas Palotai filed a complaint in a Maryland state court asserting that the University of Maryland and individuals associated with running the University Greenhouse violated his rights under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. He also alleged that these defendants infringed his federal and state due process rights by failing to give him a timely and fair hearing on his suspension without pay and the termination of his employment with the University. The defendants removed the case to federal court.[1] The District Court dismissed the due process claims and subsequently granted summary judgment on the remaining ADA claims. Palotai timely appealed.

### I

#### A. *Factual Background*

Palotai worked from November of 1994 to June of 1997 as an Agricultural Technician in the Greenhouse operated by the University of Maryland's Department of Natural Resource Sciences and Land-

---

[1]The University waived its Eleventh Amendment immunity by removing the case against it to the District Court. *See Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. ___, 122 S.Ct. 1640 (2002).

scape Architecture. The Greenhouse is maintained for the care of plant specimens used for both research and teaching. It is essential that the plant material which the faculty entrusts to the Greenhouse be maintained in strict accordance with the specifications provided.

Palotai's "responsibilities included supervision of all aspects of plant care and maintenance, pest control, maintenance of all spraying and other equipment, treatment of cooling system, and disposal of hazardous wastes." App. at 13-14. According to Palotai, he had difficulty performing some of his required tasks within the appropriate deadlines because of a learning disability. Palotai informed Pamela McGrath, the Assistant Manager of the Greenhouse, of this disability in June of 1995.

In the summer of 1996, Laurie Hellman-Aker, the Greenhouse Manager, created a system of "time frames." This was a schedule that let Palotai know how much time he was to allot to each task. Palotai expressed concern about these "time frames," and during the summer, six meetings were held to discuss Palotai's concerns. After each one, Hellman-Aker reprimanded Palotai for failing to comply with the stipulated schedule. The University kept the "time frames" in place.

Later that fall, Palotai suffered an accidental eye injury while spraying the Greenhouse with pesticides. He claims that as a result of this injury he was blind in one eye and told Hellman-Aker that he would not be able to perform his responsibilities. Despite Palotai's protestations, Hellman-Aker continued to require him to spray the Greenhouse with pesticides. The complaint alleges that because he was unable to read his work list due to the blindness, Palotai sprayed the wrong section of the Greenhouse. In reaction to this incident, Hellman-Akers issued Palotai a five-day unpaid suspension, effective October 10, 1996.

On October 16, 1996, Palotai filed a discrimination complaint with the University's EEOC office. The complaint was investigated and resulted in a finding of "no discrimination."

On October 17, 1996, after his treating ophthalmologist advised him that he could not work with pesticides, Palotai told Hellman-Aker that he could not work until his eye was healed, and requested that

he be placed on sick leave until testing on his eye was complete. In response to this request, Hellman-Aker extended the suspension an additional day, then placed Palotai on sick leave. Palotai remained on sick leave until early December.

At about the same time, Palotai wrote to the University EEO counselor requesting that the University make a "reasonable accommodation" for his disability by removing the time frames from his work assignments. Hellman-Aker responded to this request one month later indicating that she believed that the time frames were beneficial to Palotai's work habits. On February 23, 1997, Palotai requested a transfer out of the Greenhouse; that request was denied.

On June 5, 1997, Palotai received a letter from Professor Richard A. Weismiller, Chair of the Department, that stated in part as follows:

> In accordance with Section VIII of the University of Maryland *Personnel Policies and Rules for Classified Employees*, I am writing to inform you that effective immediately you are suspended without pay from your position of Agricultural Technician III, pending the filing of charges for your removal.

> This action is the result of your continued disregard for rules, directions and safety standards in the Greenhouse. On Friday, May 30, 1997, you were verbally counseled by your supervisor for failing to wear protective eye equipment while in the greenhouse area during the re-entry interval as required by E.P.A. Worker Protection Standards. This is particularly disturbing in light of your eye injury last fall which occurred as a result of your failure to comply with these standards. On Monday, June 2, 1997, you again disregarded instructions in your failure to accurately record pesticide applications for each greenhouse as required by your supervisor to meet Maryland Department of Agriculture standards. On Wednesday morning, June 4, 1997, you were found without appropriate protective eyewear in an area which had been sprayed the night before. This morning, June 5, 1997, you were working in shorts in an area requiring protective legwear. These incidents, together with your

disciplinary history and record of disregarding Greenhouse rules, leave me no choice but to take this action.

App. at 412.

Palotai had no prior notice of this suspension without pay. When Professor Weismiller made the decision to suspend Palotai, he was familiar with Palotai's disciplinary record over the preceding two and a half years which revealed that Greenhouse administrators had reprimanded Palotai at least 42 times. His information about the events of May 30th through June 5th came directly from Palotai's immediate supervisor, Ms. Hellman-Aker. He did not independently investigate the facts before making his decision.

Palotai immediately appealed his suspension. On June 17, 1997, Palotai received charges for removal from the University. Palotai also appealed the removal charges.

B. *Suspension, Termination, and Administrative Review*

The governing regulations of the University provide that a hearing will be held within five working days after an employee appeals a suspension. The hearing on Palotai's suspension was convened on July 10, 1997. The hearing was not completed on that date, however, and was continued until August 14, 1997. The Hearing Examiner issued a decision one week after the completion of the hearing, on August 21, 1997. In that decision, the Examiner found that "Mr. Palotai's position as an Agricultural Technician requires him to work closely with extremely dangerous chemicals." Decision of the Hearing Examiner at 6. Further, the Examiner concluded, "given the potential for severe injury to Mr. Palotai and liability to the University as a result of the failure to take appropriate safety measures when handling pesticides and other chemicals in the greenhouses, the only viable option available to the University is to suspend this employee pending final disposition of the charges." *Id.*

Prior to a resolution of the suspension issue, Palotai received his formal charges of removal. Palotai timely requested a hearing on his termination. In the case of removal, Section 13-205(a) of the Maryland Code provides:

> Within 5 days from the date on which the employee receives the charges for removal as evidenced by the return receipt or other evidence of delivery of the charges to the employee an employee who is suspended under charges for removal may request an opportunity to be heard in his own defense. Within 30 days if possible after receipt, the president or the president's designated representative shall investigate the charges and give the employee an opportunity to be heard. Testimony shall be taken under oath and both the department head or chairman or designee and the employee have the right of representation by counsel and the right to present witnesses and give evidence.

Md. Code Ann., Educ., § 13-205(a). If still unresolved after the president of the institution considers the matter, the employee may submit the grievance to arbitration or to the Office of Administrative Hearings (the "OAH"). *See id.* at § 13-203(d).

Over sixteen months after requesting a hearing on the removal charges, on November 2, 1998, Palotai received a hearing from the University. The University issued a decision upholding the termination on December 23, 1998. Palotai filed an appeal to the OAH on January 8, 1999. A hearing was held on February 24, 1999 and a decision affirming the charges of removal issued on March 11, 1999. Pursuant to the Maryland Code, Palotai requested judicial review of this decision on March 16, 1999. Palotai claimed in part that the proceedings before the OAH regarding his termination violated his due process rights. The Circuit Court for Prince George's County, Maryland, entered an order on February 29, 2000, affirming the decision of the OAH which was in turn affirmed by the Maryland Court of Special Appeals on March 19, 2001. The Maryland Court of Appeals denied certiorari on September 14, 2001.

## C.  *The Present Lawsuit*

Prior to receiving a decision from the state court on his request for judicial review of the removal charges, Palotai filed an eight count complaint in state court against the University of Maryland, Hellman-Aker, and Henry Mityga, the faculty member having the responsibility of overseeing the operation of the greenhouse. According to

Palotai, the defendants violated the ADA (Counts I and II); the Due Process Clause of the Fourteenth Amendment (Counts III, IV, V, and VI); and Articles 19 & 24 of the Maryland Declaration of Rights, the state law counterpart to the Due Process Clause (Counts VII and VIII).

Following removal to the District Court, the individual defendants and the University moved to dismiss. In the responsive pleadings to those motions, Palotai conceded that individuals cannot be held liable under the ADA, and voluntarily withdrew his claims against Hellman-Aker and Mityga under the ADA. Further, Palotai voluntarily withdrew claims IV and VI, which alleged due process claims against the University because the institution is not a proper defendant under 42 U.S.C. § 1983.

The Court dismissed with prejudice Counts III and VII, which stated due process claims against the individual defendants for failing to provide a suspension hearing within an appropriate time frame. It dismissed for lack of jurisdiction Counts V and VIII, which asserted due process claims relating to the termination hearing. The Court's order granted Palotai an opportunity to amend his complaint to set forth his ADA claims with greater specificity.

Three months after Palotai filed his First Amended Complaint, the state filed a motion for summary judgment on the ADA claims. The Court granted defendants' motion finding that Palotai had not tendered evidence tending to show (1) that he was disabled under the ADA or (2) that there was a causal connection between any disability and his suspension or removal.

II

A. *The Suspension Hearing Claims*

Palotai claims that the University violated his due process rights by failing to provide a hearing prior to suspending him without pay. He further insists that his post-suspension hearing was constitutionally infirm.

We will assume for present purposes that Palotai had a cognizable property interest in his job that triggered the protection afforded by the Due Process Clause. *See, e.g*, *FDIC v. Mallen*, 486 U.S. 230, 240 (1988). Thus, we will proceed to determine what process the state owed Palotai, and whether the state met that threshold. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("Once it is determined that due process applies, the question remains what process is due.").

Although there is a preference for pre-deprivation process to protect an individual's property interest, post-deprivation process will suffice in certain situations. *See Gilbert v. Homar*, 520 U.S. 924, 930 (1997). Where there is an "important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted," the state may be justified in delaying "the opportunity to be heard until after the initial deprivation." *Mallen*, 486 U.S. at 240. Where the state has "probable cause to believe" that the employee's continuing employment will jeopardize an important governmental interest, there is the required assurance that the deprivation is not baseless or unwarranted. *Barry v. Barchi*, 443 U.S. 55, 65 (1979). This was such a situation.[2]

As the Hearing Examiner ultimately found, the University had an important interest not only in the mission of the greenhouse facility and the safety of those employed there, but also in avoiding the legal and other potential consequences of misuse of the toxic chemicals at that facility. Based on the information he received from the manager of the greenhouse and Palotai's immediate supervisor, Professor Weismiller had reason to believe that Palotai had violated safety rules relating to the use of those toxic chemicals on four occasions within a week and had disregarded three reprimands for having done so. This, combined with Palotai's overall disciplinary record, gave ample

---

[2]We note at the outset of our analysis of this issue that Palotai in his briefing before us does not object to the District Court's consideration of portions of the record other than the allegations of the complaint in the course of granting the defendants' motion to dismiss. Indeed, Palotai's brief relies heavily on the deposition testimony of Professor Weismiller in support of his position. Accordingly, it is appropriate for us to rely on uncontradicted portions of the record other than the allegations of the complaint.

cause to believe that further misuse of toxic substances would be likely to occur if Palotai were permitted to continue working at the greenhouse.

Palotai does not dispute that the University has an important interest in avoiding the potential consequences of the misuse of toxic chemicals. He insists that the reprimands between May 30th and June 5th, as well as many of the earlier reprimands, were not justified and that Professor Weismiller should have conducted an independent investigation or at least talked with him before issuing the suspension letter. Investigations and hearings with the notice required to make them meaningful take time, however, and the state is not required to take that time when it has probable cause to believe that immediate suspension is required to serve its important interest. Ms. Hellman-Aker held a responsible position at the University, was Palotai's direct supervisor, and was a participant in many of the reprimands. Her report provided the required probable cause without the necessity of corroborating evidence. The failure to give Palotai a pre-suspension hearing did not violate his due process rights.

Nor can Palotai justifiably claim that his post-suspension hearing was constitutionally infirm. First, the delay in holding the hearing was not impermissibly long. "[E]ven though there is a point at which an unjustified delay in completing a post-deprivation proceeding 'would become a constitutional violation,' . . . the significance of such a delay cannot be evaluated in a vacuum." *Mallen*, 486 U.S. at 242 (citation omitted). Courts must consider "the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken." *Id.*

The hearing commenced approximately one month after Palotai's suspension and the hearing was continued for approximately five weeks until August 14, 1997. The total delay between the suspension and Hearing Examiner's decision was approximately two and a half months. Under the circumstances, this delay was not so extensive as to be impermissible. *See, e.g.*, *Mallen*, 486 U.S. at 243 (allowing a 90 day delay for continuing suspension). Palotai claims that the defendants continued the hearing through July and August because

Hellman-Aker was on family leave. If so, the desirability of having a key witness available at the hearing seems apparent and indicates that the delay was not without legitimate justification.

We do not find it significant that the Maryland law requires a hearing on removal charges within 5 days of the appeal of the deprivation. Violation of a state-mandated procedure does not constitute a violation of constitutional due process protections. *See Morris v. City of Danville*, 744 F.2d 1041, 1048 n.9 (4th Cir. 1984) (recognizing that the "mere fact that a state agency violates its own procedures does not, *ipso facto*, mean that it has contravened federal due process requirements").

Lastly, Palotai claims that the hearing "violated [his] substantive constitutional due process rights because [he] was denied a fair trial." Appellant's Brief at 53. His argument is that the hearing examiner was biased. We can find no discernible bias in the Hearing Examiner's conduct or reasoning. She considered both Palotai's and the University's evidence and made reasonable findings based on that evidence.

### B.   *The Termination Hearing Claims*

The District Court dismissed the due process claims related to the termination hearing because no federal court other than the Supreme Court has jurisdiction to review a state court judgment. *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Guess v. Board of Med. Exam'rs of North Carolina*, 967 F.2d 998 (4th Cir. 1992). This rule, commonly known as the Rooker-Feldman doctrine, applies even to constitutional claims where such claims are "inextricably intertwined with the state court's denial in a judicial proceeding of a particular plaintiff's [claim]." *Feldman*, 460 U.S. at 483-84 n.16; *Czura v. Supreme Court of South Carolina*, 813 F.2d 644, 646 (4th Cir. 1987).

Here, the Circuit Court for Prince George's County considered Palotai's claims of substantive and procedural due process violations in its review of the termination hearing. That court held that the ALJ provided Palotai a fair procedure to submit evidence and that the ALJ considered the evidence Palotai chose to submit. Further, the state

court gave credence to the ALJ's finding that the major delays in the process were due to Palotai, not the University. And any minor delay, such as the one between the hearing and the issuing of the decision, was found not to prejudice Palotai. Accordingly, the court declined to find due process violations.

The District Court properly held that it could not rule on Palotai's claims regarding the termination hearing without reviewing the outstanding state court's judgment. Thus, we will affirm the District Court's decision to dismiss these claims for want of jurisdiction under the Rooker-Feldman doctrine.[3]

III

We will also affirm the summary judgment entered by the District Court on Palotai's ADA claim for essentially the reasons given by it.

Palotai alleges that the University violated his rights under the ADA by imposing arbitrary "time frames" on him because of his disabilities and by refusing his request to accommodate his disabilities by dispensing with those time frames. To succeed on these claims, Palotai must first show that he is "disabled" within the meaning of the ADA. *See Rhoads v. FDIC*, 257 F.3d 373, 387 (4th Cir. 2001). The ADA defines a "disability" in part as "a physical or mental impairment that substantially limits one or more of the major life activities."

---

[3]Appellant alleges that the University of Maryland violated both his federal and state due process rights. Appellant's state due process claims are based on Articles 19 and 24 of the Maryland Constitution. The Court of Appeals of Maryland has held that the due process clauses of the Maryland Constitution have the same meaning as the Due Process Clause of the Fourteenth Amendment of the Federal Constitution. *See Department of Transp., Motor Vehicle Admin. v. Armacost*, 474 A.2d 191 (Md. 1984); *see also Sanner v. Trustees of Shippard and Enoch Pratt Hosp.*, 278 F. Supp. 138, 141 (D. Md.), *aff'd*, 398 F.2d 226 (4th Cir. 1968) ("[I]n construing [Articles 19, 20, and 23 (now 24)] the Maryland court has held that the decisions of the Supreme Court are practically direct authority."). Thus, having concluded that Palotai's complaint failed to state a cause of action under the Due Process Clause of the United States Constitution, the District Court properly determined that the claim under the Maryland Constitution had to be dismissed as well.

42 U.S.C. § 12102(2)(A). Examples of major life activities are "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). When the major life activity at issue is working, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* at. § 1630.2(j)(3)(i). The determination of whether an individual is disabled is an individualized inquiry, particular to the facts of each case. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999). "The phrase 'substantially limits' sets a threshold that excludes minor impairments from coverage under the ADA." *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001). "Substantially limits" means:

> (i)   Unable to perform a major life activity that the average person in the general population can perform; or

> (ii)   Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(i)-(ii).

The impairments that are alleged to make Palotai "disabled" are: (1) "learning disabilities"; (2) "obsessive/compulsive disorder" (OCD); and (3) "recurrent central serous retinopathy." The last is alleged to be a substantial impairment on the major life activity of seeing, and the first and second are said to be substantial impairments on the major life activities of learning and working. The record contains evidence that would support a finding that Palotai has each of these conditions. As the District Court noted, however, the record does not contain evidence that would support a finding that he has a legally relevant disability for purposes of his ADA claim.

With respect to Palotai's learning disabilities, upon which he places primary reliance, the record contains no evidence from which a trier of fact could conclude that they substantially limit his ability to work or his ability to learn in any way here relevant. To the extent Palotai is relying on the proposition that his "learning disabilities" substan-

tially limit his ability to work, he must show that this disability precluded him from a substantial class of jobs. *See* 29 C.F.R. § 1630.2(j)(3)(i). This he has not done.

To the extent that Palotai claims that his learning disabilities substantially limit the major life activity of learning, Palotai must show that his impairment significantly restricts his ability to learn. In evaluating this claim, we must consider whether Palotai is unable to learn in comparison to the average person in the general population.

The record evidencing that Palotai has learning disabilities consists of a report of a psychologist, following testing in April of 1994. Its purpose was not to compare Palotai's ability to learn with that of an average person in the general population and, not surprisingly, it does not provide a basis for doing so. This deficiency is particularly crucial in a case like this one in which the person claiming a significant limitation on his ability to learn has a demonstrated record of academic achievement and has been able to quickly learn skills required by the only working experience documented in the record. As of the time of his employment with the University, Palotai had a B.S. degree in biology and the sciences and had 30 hours of graduate work in education. When Palotai first came to the University, he had no difficulty in promptly mastering the responsibilities of his job. As his brief describes his experience during his probationary period:

> The record proves that the Appellant adequately performed the essential functions of his Ag Tech job in accordance with his official position description. In the Greenhouses, the Appellant supervised all aspects of plant care and maintenance, pest program control, treatment of the cooling system with Triathlon, and the disposal of hazardous materials. It was the Appellant, not Hellman-Aker, who supervised and trained the college students working as hourly employees in the Greenhouse. Appellant trained the new employees in all aspects of plant care and maintenance [watering, ventilation, trimming and propagation of new plants,] and in the pest program [spraying and regulations].
>
> Appellant's performance rating after initial probation indicated that he performed all job functions in a satisfactory manner.

Appellant's Reply Br. at 2 (citing App. at 192).

With respect to Palotai's OCD, the record contains two handwritten, barely legible reports of psychiatrists dating from late 1996, one of which describes Palotai as having "compulsions" and "obsessions." Neither, however, would support a finding that his OCD rendered him unable to perform a substantial class of jobs or that his capacity to learn is less than the average person in the general population.

Lastly, Palotai cannot demonstrate this his eye impairment constitutes a disability. The record evidences that two ophthalmologists diagnosed Palotai as having central serous retinopathy. Their reports reveal the following:

1. Palotai first presented with central serous retinopathy in December of 1995. The problem "resolved spontaneously." App. at 183.

2. The central serous retinopathy returned in October of 1996 and his vision in his left eye dropped to 20/200. The problem was treated successfully with laser surgery and the vision returned to 20/25.

3. On July 2, 1997, his vision was 20/40 in the left eye.

4. On May 29, 1998, his vision was 20/40 in his left eye and 20/30 in his right. Palotai reported that he felt his vision had gradually improved since his surgery in 1996.

5. While there was "no evidence of active retinopathy" in May 1998, Palotai "is at risk for further episodes of central serous." App. at 183.

6. "Based on AMA guidelines, Mr. Palotai's left eye is 15% impaired with the five Maryland disability factors applied." *Id.*

We agree with the District Court that this record would not support a finding that Palotai's central serous retinopathy constituted a "disability" for purposes of the ADA during any period relevant here. *See Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 559, 566 (1999) (evi-

dence of "amblyopia, an uncorrectable condition that [left plaintiff] with 20/200 vision in his left eye and monocular vision in effect" did not alone establish that plaintiff was "disabled"); *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 468 (4th Cir. 2002) (". . . a temporary impairment, such as recuperation from surgery, will generally not qualify as a disability under the ADA. . . . An impairment simply cannot be a substantial limitation on a major life activity if it is expected to improve in a relatively short period of time.").

Moreover, even assuming that Palotai could establish that his impairments constituted a disability under the ADA, we agree with the District Court that the "time frames" resulted from the demands of the job, and that any accommodation involving the elimination of time constraints and deadlines was not a reasonable one. As the District Court put it:

> The core of the case, however, has to do with the time frames that are established, and that they were inequitably imposed upon the plaintiff. That seems to be the issue that the plaintiff says is the core of his case, and the removal of the time frames is what he was seeking.

> The defendant argues that this is essentially an open-ended work schedule and that would not be a fair, reasonable accommodation, but one has to look specifically at the context of the job that the plaintiff held. He was in a greenhouse involving plants.

> In the letter from Ms. Hellman-Aker to Mr. Palotai sent in 1997, the language, it seems to me, is quite relevant when one considers whether there even could be a reasonable accommodation in this case, assuming a learning disability, assuming that it somehow substantially limited activities, assuming that there was a request for reasonable accommodation ultimately. The question has to be whether there could be a reasonable accommodation for someone similarly placed as plaintiff.

> Here is what Ms. Hellman-Aker says.

"Performance of your functions on a strict time schedule is an essential function of your position. As you know, living plant material that exists as part of a research project or specimens for teaching must be cared for according to the exact specifications provided. As little as thirty (30) minutes sometimes makes the difference between a quality plant or a dead plant. The importance of time management and prompt completion of assigned duties is made all the more important due to the limited staffing available within greenhouse budget constraints.

It is critical that University plant material be cared for four times a day to ensure healthy growth and survival. Such a schedule is necessary due to the sheer mass and diversity of plantlife maintained at the greenhouse. To ensure the highest quality of care, the greenhouse has developed the following schedule for watering and venting: morning watering and venting, noon check, afternoon watering and venting; an evening walk-through. If the plants are not checked in a timely manner, the result is poor plant growth or death. In the summer, if ventilation is not completed by 10:00 a.m., plants may be lost or become severely stressed. Greenhouse temperatures can easily exceed 120 degrees F. Soil sterilization occurs at 150 degrees F. In the winter months, if vents are left open, plants freeze or are stressed due to cold temperatures. Accordingly, it is imperative that watering and venting be performed on a timely basis.

Similarly, it is imperative that pesticide applications be made in a timely fashion. Due to EPA WPS laws and general safety considerations, these applications must be coordinated around classes, employees, researchers, and weather conditions. If the applications are not performed as scheduled, windows of opportunity for spraying may be missed, directly impacting on client service."

\* \* \*

The Court finds that there really is no material issue, genuine issue of material fact in this regard as to, at a minimum,

the inability of the defendant to accommodate plaintiff as he saw it; that is, that the reasonable accommodation sought by the plaintiff was not in fact reasonable, even assuming, as I say, that he had a disability that affected one of his major life activities.

The Court finds, however, as a matter of law that the plaintiff has not adduced a sufficient demonstration that he was in fact unable to work in other positions or that his learning disability in fact was the cause of his inability to perform in a timely fashion. As I say, a reasonable accommodation, to the extent that it could have been given, was given. It could not have been given as a matter of law in the manner that plaintiff requested.

Mot. Summ. J. Hr'g Tr. at 58-62. We agree.[4]

IV

Accordingly, the District Court's order of July 18, 2000, dismissing the due process claims and its summary judgment in favor of the defendants on the ADA claims will be affirmed.

*AFFIRMED*

---

[4]Palotai asserted a retaliation claim in the District Court alleging that he had been terminated on June 17, 1997, in retaliation for the filing of his EEOC complaint on October 16, 1996. We do not understand him to claim before us that the District Court's summary judgment against him on this claim was reversible error. We agree with the District Court's disposition of this claim, however. Viewing the summary judgment record as a whole, including the eight month period between the complaint and Palotai's termination, a trier of fact could not reasonably conclude that the University's articulated reasons for his reprimands and termination were pretextual and that the real reason was activity protected by the ADA.