**Timothy BATEMAN, Plaintiff,**

v.

**AMERICAN AIRLINES, INC., Defendant.**

**Case No. 1:07cv1307 (GBL).**

United States District Court, E.D. Virginia, Alexandria Division.

March 9, 2009.

Rafael Morell, for Defendant.

Michael T. Pritchard, for Plaintiff.

### *MEMORANDUM ORDER*

GERALD BRUCE LEE, District Judge.

THIS MATTER is before the Court on Defendant American Airlines's Motion for Summary Judgment. This case concerns Plaintiff Timothy Bateman's wrongful termination, failure to accommodate, race discrimination, and retaliation claims against his former employer American Airlines ("American"). Mr. Bateman alleges that American refused him a reasonable accommodation after an injury at work and wrongfully terminated him just days after he returned from an involuntary medical leave of absence. There are seven issues before the Court. The first issue is whether Plaintiff properly exhausted his administrative remedies as to his discriminatory discharge claims where his 2006 Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination ("2006 Charge") alleged retaliation but failed to specifically re-allege discrimination as contained in his earlier 2005 EEOC Charge of Discrimination ("2005 Charge"). Second, the issue is whether temporary neck and back injuries qualified Plaintiff as actually disabled within the meaning of the Americans with Disabilities Act ("ADA"). Third, the issue is whether Plaintiff can show wrongful termination if regarded as disabled where his employer initially thought his impairment might be long term and questioned his ability to perform his specific job in the future. Fourth, the issue is whether Plaintiff, if regarded as disabled but not actually disabled, is entitled to a reasonable accommodation under the ADA. Fifth, the issue is whether Plaintiff can establish a Title VII disparate treatment claim on the basis of race where the similarly-situated comparator he identifies does not hold the same position within American. Sixth, the issue is whether Plaintiff can establish Title VII and ADA retaliation claims where his discharge occurred eight months after his protected activity of filing his 2005 EEOC complaint. Seventh, the issue is whether Plaintiff can show pretext in the retaliation context where Defendant stated that it discharged Plaintiff as part of a reduction-in-force ("RIF"), not for discriminatory reasons.

The Court grants summary judgment in favor of Defendant on Plaintiff's wrongful discharge and failure to accommodate claims, but denies summary judgment on Plaintiff's race discrimination and retaliation claims. First, the Court holds that Plaintiff properly exhausted his administrative remedies as to his discrimination claims when he filed his 2006 EEOC retaliation complaint. Although the 2006 Charge specifically alleged only retaliation, a reasonable investigation conducted by the EEOC would naturally lead it to un-

cover the underlying protected activity, the 2005 EEOC discrimination complaint, which expressly alleged both race and disability discrimination. Second, the Court holds that Plaintiff's ADA wrongful discharge claim fails because Plaintiff's temporary impairment did not render him actually disabled under the ADA and the *Toyota* analysis. Third, Plaintiff also cannot show wrongful termination on the basis of being regarded as disabled because Defendant did not regard him as being unable to perform a broad range of jobs *at the time of his discharge.* Fourth, the Court also holds that Plaintiff's failure to accommodate claim fails because Plaintiff was not actually disabled and, even if regarded as disabled, being regarded as disabled would not entitle him to a reasonable accommodation. Fifth, the Court holds that a genuine issue for trial exists as to Plaintiff's Title VII disparate treatment claim because a similarly-situated comparator may be similar to Plaintiff in all relevant respects despite having a different job title. Sixth, the Court holds that Plaintiff can establish the causal element of his retaliation claim despite an eight-month gap in time because a genuine issue for trial exists as to whether Defendant's retaliatory motive remained dormant while Plaintiff was on leave but sprung back to life once he returned to work. Seventh, the Court holds that Plaintiff may be able to establish pretext as to his retaliation claims because there is a genuine issue for trial as to whether Defendant's isolated, undocumented RIF was simply pretext for a retaliatory discharge.

## I. BACKGROUND

Plaintiff Timothy Bateman is an African–American formerly employed as a purser flight service manager by Defendant American Airlines. On July 9, 2003, Mr. Bateman fell backwards over his chair and injured his back and neck while at work. American prohibited Mr. Bateman's return to work until his physician lifted several of the work restrictions imposed consequent to his accident. Mr. Bateman took an involuntary medical leave of absence for approximately twelve months, and was fired four days after he returned to his job. Mr. Bateman now brings five claims against American: Count I (Wrongful Discharge in Violation of ADA); Count II (Failure to Accommodate in Violation of ADA); Count III (Discrimination Based on Race in Violation of Title VII); Count IV (Retaliation in Violation of Title VII); and Count V (Retaliation in Violation of the ADA). American now moves for summary judgment on all five claims.

Mr. Bateman began working for American in 1989 as a flight service manager at Dulles International Airport. He worked in that position until 1995, at which time he became a purser flight service manager. As a flight service manager, Mr. Bateman was responsible for supervising, coordinating, and directing the job performance and activities of flight attendants. As a purser flight service manager, he supervised both flight attendants and purser flight attendants. All of the purser flight attendants in the Washington, D.C., area reported to Mr. Bateman. Of the six flight service managers in the Washington, D.C., area, Mr. Bateman was the only purser flight service manager.

On July 9, 2003, Mr. Bateman fell backwards over his chair while at work and injured his back and neck. Despite his injuries, he continued to work until he visited his physician on August 13, 2003, at which time he was diagnosed with a L4–L5 herniated disc in his back and a C5–C6 protruding disc in his neck. Mr. Bateman's injuries required extensive physical therapy and rehabilitation. As a result, he took medical leave from work for approxi-

mately seventeen months. Until the time of his accident, Mr. Bateman had almost eighteen consecutive years of perfect attendance at work.

American made changes during Mr. Bateman's absence. Mr. Joseph Bellinger, Mr. Bateman's supervisor from July 2003 until Spring 2004, was replaced by Mr. Kent Powell. Mr. Powell never had an opportunity to supervise Mr. Bateman prior to his accident. In 2004, Mr. Powell hired Ms. Dana Turner, a white female, to permanently fill Mr. Bateman's position.

Also during that time, several people at American believed that Mr. Bateman could be returned to work in some capacity. In February 2004, Mr. Bellinger indicated that Mr. Bateman could be approved to work in an office position and stated that Mr. Bateman was "not needed to fly." In September 2004, Dr. Tom Bettes from American's medical staff told Mr. Powell on at least two separate occasions that he thought Mr. Bateman could return to work in a sedentary position. Dr. Bettes's concern was that Mr. Bateman be returned to work in some capacity to speed his recovery and facilitate his transition back into the workforce.

On January 5, 2005, Mr. Bateman's physician, Dr. Bonelli, cleared him to return to work with light duty restrictions. The restrictions included the following: no heavy lifting, no "flying until further notice", no climbing more than two flights of stairs, no stooping, no bending or kneeling, no reaching, minimal use of the right hand, no sitting or standing for more than two hours at a time, no pushing or pulling, and no work at altitude. Consequently, Mr. Bateman immediately requested to return to work in a light duty position with a temporary no-flight status.

Despite being cleared to return to work, Mr. Powell would not allow Mr. Bateman to return until most of the work restric-tions were lifted. Mr. Powell believed that Mr. Bateman's medical restrictions were too severe to allow him to return to work. On January 5, 2005, American placed Mr. Bateman on medical leave until July 20, 2005. On April 12, 2005, Plaintiff filed a complaint with the Virginia Council on Human Rights and the EEOC for disability and race discrimination for denial of a reasonable accommodation. The 2005 Charge read as follows:

I started working for the Respondent on May 28, 1985. On or about July 9, 2003, I suffered an injury at work. As a result of my injury I have not returned to work since Aug. 13, 2003. On Dec. 21, 2004, I provided the Respondent with a request for a reasonable accommodation with a return to work date of Jan. 5, 2005. However, on Jan. 5, 2005, my manager Kent Powell advised me that despite my requested accommodation, the Respondent would not grant me an accommodation . . . .

On Jan. 2005, I received a letter . . . stating that I was being placed on "voluntary" leave of absence until Jul. 20, 2005. On Feb. 11, 2005, I was again cleared to return to work with a reasonable accommodation. The Respondent has not responded to my Feb. 11, 2005, request for an accommodation. Since Jul. 2004, the Respondent has granted at least three (3) non-black employees who have more restrictive physical limitations their request for an accommodation.

I believe I have been discriminated against because of my disability in violation of the Americans with Disabilities Act of 1990, as amended. I further believe that I have been discriminated against because of my race, black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Mr. Powell learned of Mr. Bateman's EEOC complaint on May 5, 2005.

On July 20, 2005, Mr. Bateman's doctor again cleared him to work, this time with fewer restrictions. By that time, Mr. Bateman's restrictions included: restrictions on his ability to fly, kneel, bend, push, twist, climb stairs, or carry objects more than thirty pounds. Again Mr. Bateman requested to return to work and again Mr. Powell denied his request. American placed him on a second medical leave of absence from July 20, 2005, until January 20, 2006.

Sometime in August or September 2005, American alleges that Mr. Powell became aware that American would have a RIF that would reduce the onboard service department's "head-count," the number of management employees in that department. In December 2005, Mr. Bateman's doctor cleared him to return to work with no restrictions. Later that month, Mr. Bateman informed Mr. Powell that he intended to return to work as a purser flight service manager in January 2006. According to Mr. Powell, when Mr. Bateman expressed his intention to return to work it created problems with the onboard service department's head-count. After discussions with the human resources department and Mr. John Tiliacos, the managing director of onboard services, Mr. Powell determined that one of the two purser flight service managers would be laid off. While Mr. Tiliacos oversaw the RIF to ensure the appropriate number of reductions were made, it was Mr. Powell who decided which employees would be laid off.

According to the American Airlines Manager's Reference Guide for Management and Support Staff Reduction in Force, managers must make employee termination decisions by determining the "criticality" of each employee. The four "criticality factors" are as follows:

i. What are the unique and specific specialized skills or knowledge of procedures, processes, or systems that have been demonstrated by the employee that are needed by your organization and are not readily available within your organization?

ii. What specific knowledge and skills does the employee possess that would allow him or her to immediately take over and perform a set of defined tasks from another employee in the group?

iii. Based upon an objective assessment of workload and assigned tasks, who can "add capacity," that is, take on more work than they currently are doing?

iv. Who, because of a combination of their demonstrated or documented work performance and their past ability to achieve measurable results do you consider to be essential to the organization's ability to meet specific near-term or immediate business goals/objectives?

In comparing Mr. Bateman and Ms. Turner, Mr. Powell did not speak to either of Mr. Bateman's previous supervisors about Mr. Bateman's performance, nor did he question any of the flight attendants who previously worked for Mr. Bateman. Instead, Mr. Powell relied solely upon Mr. Bateman's and Ms. Turner's 2003 performance evaluations, as that was the last year in which Mr. Bateman received an evaluation. At the time of the 2003 evaluation, Ms. Turner was a level three customer service manager and Mr. Bateman was a level four purser flight service manager. Mr. Bateman's 2003 evaluation, prepared by his former supervisor, Ms. Rosemary Dillard, indicated that he needed development in several areas, including following through on commitments, seeking opportunities to develop, and demonstrating resilience in difficult situations. Ms. Turner's evaluation was generally positive, but Ms. Turner was a customer service manager at

the time of her 2003 evaluation, which is a less demanding and less complex job than purser flight service manager.

Mr. Bateman returned to work on January 6, 2006. By January 6, Mr. Powell had made the decision to discharge Mr. Bateman instead of Ms. Turner. On January 10, 2006, Mr. Bateman was notified that he was being laid off due to the RIF. Of the 478 employees in the onboard service department, Mr. Bateman was one of three discharged. He was the only onboard services employee affected in the Washington, D.C., area.

On October 10, 2006, Mr. Bateman filed a retaliation complaint with the EEOC. He subsequently brought the present action for (1) wrongful termination in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA"); (2) denial of a reasonable accommodation in violation of the ADA; (3) retaliation in violation of the ADA; (4) discrimination based on race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); (5) and retaliation in violation of Title VII. American now moves for summary judgment on all counts.

## II. DISCUSSION

### A. Standard of Review

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once a motion for

summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at 248, 106 S.Ct. 2505; *JKC Holding Co. v. Wash. Sports Ventures, Inc.,* 264 F.3d 459, 465 (4th Cir.2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Hooven–Lewis v. Caldera,* 249 F.3d 259, 265 (4th Cir.2001). A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. Argument

The Court holds that Mr. Bateman's discriminatory discharge claims are properly before the Court because a reasonable administrative investigation into his 2006 EEOC Charge would include an in-

vestigation into the race and disability discrimination allegations contained in the 2005 Charge. The Court grants summary judgment in favor of American as to Mr. Bateman's ADA wrongful discharge claim because Mr. Bateman was not disabled within the meaning of the ADA. The Court also grants summary judgment in favor of American as to Mr. Bateman's ADA failure to accommodate claim because Mr. Bateman was not entitled to a reasonable accommodation even if American regarded him as disabled because he was not actually disabled.

The Court, however, denies summary judgment as to Mr. Bateman's Title VII race discrimination claim because American's accommodation and retention of similarly-situated white comparators creates a genuine issue for trial as to whether the disparate treatment was racially motivated. The Court also denies summary judgment as to Mr. Bateman's ADA and Title VII retaliation claims because Mr. Bateman established a prima facie case of retaliation and there is a genuine issue for trial as to whether American's RIF was a pretext for discharging Mr. Bateman. The Court addresses each issue in turn below.

### 1. Exhaustion of Administrative Remedies

■ As an initial matter, the Court finds that Mr. Bateman's discriminatory discharge claims are properly before this Court because the EEOC's investigation of his 2006 Charge would reasonably lead to an examination of his 2005 Charge alleging race and disability discrimination. In order to bring a Title VII discrimination claim, an employee must file an EEOC charge of discrimination against his employer within one hundred eighty (180) days of the alleged unlawful conduct. 42 U.S.C. § 2000e–5(e)(1). Although the EEOC charge "defines the scope of the plaintiff's right to institute a civil action," *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir.2002) (citing *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir.2000)), "[a]n administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir.1981).

■ American argues that Mr. Bateman failed to exhaust his remedies as to his discriminatory discharge claims because his 2006 Charge alleged only retaliation, not race or disability discrimination. American's position is flawed because, in order for Mr. Bateman to even establish a prima facie case of retaliation, he must show: 1) that he engaged in a protected activity; 2) that he suffered an adverse employment action at the hands of his employer; and 3) that there existed a causal connection between the protected activity and the adverse action. *Bryant v. Aiken Reg'l Med. Ctrs.*, 333 F.3d 536, 544 (4th Cir.2003); *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir.2001); *EEOC v. Reynolds Metals Co.*, 212 F.Supp.2d 530, 536 (E.D.Va.2002). Hence, the EEOC would necessarily have to examine Mr. Bateman's protected activity, which is the 2005 Complaint, to determine whether he sufficiently set forth a retaliation claim. American ignores the fact that a reasonable administrative inspection would lead the EEOC to investigate beyond the face of the 2005 Charge, which alleged both race and disability discrimination. "[I]f a plaintiff's claims in [his] judicial complaint are reasonably related to [his] EEOC charge and can be expected to follow from a reasonable administrative investigation, the

plaintiff may advance such claims in [his] subsequent civil suit." *Smith*, 202 F.3d at 247. The Fourth Circuit accepts the principle that "the scope of a Title VII lawsuit may extend to any kind of discrimination like or related to the allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission." *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir.1992). Here, the narrative of Mr. Bateman's 2006 Charge reads as follows:

I. I previously filed a charge (100–2005–00454) in 2005, alleging that after many successful years of service with Respondent as a Flight Service Manager, I was denied a reasonable accommodation and the opportunity to return to work, following an injury and related medical condition. Subsequent to the filing of my charge, on or about January 7, 2006, I provided Respondent the information that I was cleared for active status. However, a few days later, on January 10, 2006, I was discharged.

I. Respondent explained my discharge was due to "criticality factors" and that I was no longer an essential team member.

III. I believe I have been discriminated against because of retaliation, in violation of the Americans with Disability Act (ADA), as to discharge.

(2006 Charge, Pl. Opp. Ex. 15.) The 2006 Charge expressly identifies the 2005 Charge as the protected activity leading to Mr. Bateman's discharge days after returning to work. Consequently, a reasoned investigation into the 2006 Charge would lead the EEOC to examine the 2005 Charge. The 2005 Charge clearly alleges disability discrimination in American's denial of Mr. Bateman's requests for an accommodation and his placement on involuntary medical leave, as well as race discrimination in that American "granted at least three (3) non-black employees who have more restrictive physical limitations their request for an accommodation." (2005 Charge, Pl. Opp. Ex. 14.) Hence, in order for the EEOC to evaluate the merits of Mr. Bateman's retaliation claim, it would necessarily investigate American's reasons for: 1) denying his accommodation requests; 2) placing him on leave; and 3) granting the requests of others who appear similarly situated to Mr. Bateman. Because such an investigation would lead the EEOC to look into the underlying allegations of race and disability discrimination, the Court finds his remedies properly exhausted as to his discriminatory discharge claims.

### 2. Wrongful discharge under the ADA

■ The Court grants summary judgment in favor of American on Mr. Bateman's wrongful discharge claim under the ADA because Mr. Bateman was not "disabled" under the ADA and therefore cannot establish a prima facie case of discriminatory discharge. In order to bring an ADA wrongful discharge claim, a plaintiff must show that: 1) he was in the protected class; 2) he was discharged; 3) at the time of the discharge, he was performing his job at a level that met his employer's legitimate expectations; and 4) his discharge occurred under circumstances that raise a reasonable inference of wrongful discrimination. *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir.1995).

The "protected class" includes those disabled under the ADA. 42 U.S.C. § 12102(2). The ADA defines "disability" as: 1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; 2) a record of such impairment; or 3) being regarded as having such an impairment. 42 U.S.C. § 12102(2); *Pollard v. High's of*

*Balt., Inc.*, 281 F.3d 462, 467–68 (4th Cir. 2002).

### a. Actual disability

The Court finds that Mr. Bateman was not actually disabled under the ADA because his impairment was temporary. In order for a plaintiff to show actual disability, his impairment must be substantially limiting, such that he is significantly restricted in a major life activity. 29 C.F.R. § 1630.2(j)(1). Courts consider the following factors to determine if an impairment is substantially limiting: 1) the nature and severity of the impairment; 2) the duration or expected duration of the impairment; and 3) the permanent or long term impact of the impairment. 29 C.F.R. § 1630.2(j)(2); *Pollard*, 281 F.3d at 467–68.

Under *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, the test for disability is a stringent one.[1] 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). "The terms 'substantially' and 'major,' as used in the ADA provision defining 'disability' as an impairment that substantially limits one or more major life activities, need to be interpreted strictly to create a demanding standard for qualifying as disabled...." *Id.* at 197, 122 S.Ct. 681. As noted by the Fourth Circuit, "[t]he ADA simply was not designed to protect the public from all adverse effects of ill-health and misfortune. Rather, the ADA was designed to assure that truly disabled, but genuinely capable, individuals will not face

discrimination in employment because of stereotypes about the insurmountability of their handicaps." *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 200 (4th Cir. 1997).

Mr. Bateman argues that his twenty-eight month neck and back injury qualified him as disabled, but temporary back injuries such as his rarely constitute disabilities under the *Toyota* analysis. *See Pollard*, 281 F.3d 462 (nine month absence from work due to temporary back injury did not constitute disability); *Halperin*, 128 F.3d at 191 ("[I]t is evident that the term 'disability' does not include temporary medical conditions ... even if those conditions require extended leaves of absence from work.").

Mr. Bateman argues that a case-specific approach of the type mentioned in *Pollard* will show him disabled, but his argument fails even under the *Pollard* approach. There, the Fourth Circuit noted that, "while the presumption exists that temporary impairments do not qualify as disabilities under the ADA, temporary conditions still require a case-by-case evaluation under the Act." 281 F.3d at 468. In conducting such an evaluation, a court must examine "how severe [a] particular impairment was, how long [it] was expected to last, and how likely it was that [the] impairment would be ameliorated over time." *Id.* at 469. Applying this test, the court in *Pollard* determined that Ms. Pollard's impairment failed to constitute a disability. First, the court found her nine month ab-

---

1. Although Congress expressly overruled *Toyota* by the ADA Amendments Act of 2008, the ADA Amendments do not apply retroactively. *See, e.g., Tish v. Magee–Women's Hosp. of the Univ. of Pittsburgh Med. Ctr.*, No. 2:06–cv–820, 2008 WL 4790733, at *5 (W.D.Pa. Oct. 27, 2008)("While *Sutton* and *Toyota Motor Manufacturing* will no longer be applicable to claims arising under the ADA and the Rehabilitation Act upon the arrival of the new year, they do govern the legal obligations of [defen-

dant] in this case. Accordingly, the Court will evaluate Tish's claims in accordance with those decisions."); *Knox v. City of Monroe*, No. 07–606, 2008 WL 5157913, at *5 (W.D.La. Dec. 9, 2008)("[T]he amendments to the ADA are not effective until January 9, 2009, and the Court must use the laws and interpretations of those laws in effect at the time of the complained—of actions."). Hence, *Toyota* remains controlling in the present case.

sence from work insufficient to demonstrate that her impairment was permanent or long term, noting that "[r]ecovering from surgery can frequently take several months .... [but that] physical impairments while recuperating from surgery are not evidence of a permanent disability." *Id.* Second, the court found no evidence to suggest that either Ms. Pollard, her physician, or High's expected her condition to be permanent. *Id.* The court found particularly telling her physician's statements that her condition was temporary and that she should soon resume her duties, as "[d]octors' evaluations, which indicate that an individual's impairment is improving, are persuasive evidence that the impairment is expected to be only temporary." *Id.*

■ Mr. Bateman's argument that he is disabled fails for two of the reasons addressed in *Pollard.* First, Mr. Bateman's extended recovery period alone did not suggest that his condition was permanent. Although it took twenty-eight months to recover, his physician's evaluations indicate that his condition progressively improved throughout the twenty-eight month period. The initial list of restrictions imposed by his treating physician on January 5, 2005, was reduced six months later on July 20, 2005, and by December 2005 he was cleared to return to work without any restrictions.

Second, the record clearly indicates that both Mr. Bateman's treating physician and American's medical staff considered his condition temporary. Dr. Bettes often referred to Mr. Bateman's "temporary work restrictions" when communicating with management about his condition. (See Pl. Opp. Ex. 12A, AMR 01790, 01792.) In addition, starting as early as December 23, 2003, Mr. Bateman's own physician, Dr. Bonelli, consistently indicated on American's Medical Substantiation Requirements forms that the imposed work restrictions were temporary. (See Bateman Dep. Exs. 4–9, 11, 13, and 14.) On those same forms, Dr. Bonelli repeatedly responded "No" to the question, "Has the patient reached Maximum Medical Improvement?" (Id.) It is clear that both Mr. Bateman's own physician and the medical staff at American considered his condition a temporary one from which he would improve. As a result, this Court finds no genuine issue as to whether Mr. Bateman was actually disabled under the ADA.

### b. *Regarded as disabled*

■ The Court also finds that Mr. Bateman was not regarded as disabled at the time of his discharge. A plaintiff may be regarded as disabled under the ADA if either "(1) a covered entity mistakenly believes that [he] has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). An employer regards an employee as substantially limited in his ability to work if the employer perceives him "to be significantly restricted in his ability to perform either a class of jobs or a broad range of jobs in various classes." *Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294, 303 (4th Cir.1998).

■ Here, the record does not support Mr. Bateman's contention that American considered him significantly restricted in his ability to perform a broad range of jobs for two reasons. First, the record indicates that, although American believed Mr. Bateman's injuries prevented him from doing his specific job, there is ample evidence showing that American's medical staff found him fit for other jobs within the corporation. On September 8, 2004, even

before Mr. Bateman's own physician cleared him to return to work, Dr. Bettes recommended that Mr. Powell should "consider returning [Mr. Bateman] to work immediately with the above restrictions on a temporary basis" and stated that the "availability of some light duty work may be helpful in eventually returning him to work in some capacity." (Pl. Opp. Ex. 12B at 2.) On September 21, 2004, Dr. Bettes stated that "[i]t is my opinion that these temporary restrictions could be accommodated with a sedentary type job accommodation." (Pl. Opp. Ex. 12A at 3.) Furthermore, on January 5, 2005, the day that Mr. Bateman's physician cleared him to return to work, Dr. Bettes again stated that "[i]t is my medical opinion that the above restrictions do not preclude a return to duty in a sedentary-type position, and that accommodating him would most likely speed his recovery and eventual return to a full duty position." (Pl. Opp. Ex. 12A at 5.)

Second, even if American regarded him as disabled at some point during his recovery period, there are no facts suggesting that American still held that perception at the time of his discharge. Mr. Bateman points to several statements made by Mr. Powell and Mr. Tiliacos as evidence that they regarded him as disabled, but those statements refer to perceptions held months before his actual discharge. (Pl. Opp. at 5–6.) For example, Mr. Powell believed that Mr. Bateman's condition as of August 2005 prevented him from even performing a job that required him to prepare written reports, but by January 2006 Mr. Powell had revised his opinion, finding Mr. Bateman only limited in his ability to fly. (Powell Dep. 105, 122.) Mr.

Bateman also points to Mr. Tiliacos's statement on January 5, 2006, that Mr. Bateman's condition "would suggest he's bed-ridden." (Pl. Opp. Ex. 29.) However, when viewed in the proper context, Mr. Tiliacos's statement was in direct response to an email from Mr. Powell in which Mr. Powell mistook Mr. Bateman's January 2005 condition as his January 2006 condition. (See id.) Mr. Powell cleared up the confusion less than two hours later, stating "[m]y mistake all … I see this is in reverse order … read the date of Jan 5 and thought it was today … but it's 2005, not 2006. Must read from top to bottom … so he's cleared with no restrictions except unable to fly at this time…." (Id.) As such, Mr. Bateman cannot show that he was actually or regarded as disabled at the time of his discharge.

### 3. *Failure to accommodate under the ADA*

The Court grants summary judgment in favor of American as to Mr. Bateman's failure to accommodate claim because Mr. Bateman was not entitled to a reasonable accommodation under the ADA even if American regarded him as disabled because there is no right to an accommodation where an individual is merely regarded as, but is not actually, disabled.[2] Mr. Bateman argues that he was entitled to a reasonable accommodation even if not actually disabled if American regarded him as so. Although this issue remains an open question in the Fourth Circuit, the majority view is that employers have no duty to offer a reasonable accommodation to employees who are merely regarded as disabled. *See Kaplan v. City of N. Las*

---

2. As the Court noted above, while Mr. Bateman cannot show that he was regarded as disabled at the time of his discharge, there may be facts suggesting that American regarded him as disabled at various stages throughout his recovery period. Regardless, a showing that he was regarded as disabled at various points in time will not save his failure to accommodate claim, as the Court will explain, below.

*Vegas,* 323 F.3d 1226, 1232 (9th Cir.2003) ("To require accommodation for those not truly disabled would compel employers to waste resources unnecessarily...."); *Weber v. Strippit, Inc.,* 186 F.3d 907, 916 (8th Cir.1999) ("Imposing liability on employers who fail to accommodate non-disabled employees who are simply regarded as disabled would lead to bizarre results"); *Workman v. Frito-Lay, Inc.,* 165 F.3d 460, 467 (6th Cir.1999) (holding that "regarded as" disabled plaintiffs are not entitled to a reasonable accommodation); *Newberry v. E. Tex. State Univ.,* 161 F.3d 276, 280 (5th Cir.1998) (same); *Deane v. Pocono Med. Ctr.,* 142 F.3d 138 (3rd Cir.1998) (declining to rule on the issue but recognizing the "considerable force" of the argument that "regarded as" persons are not entitled to accommodation under the ADA). The 2008 Amendments to the ADA formally adopt this position, as the law now states: "A covered entity ... need not provide a reasonable accommodation ... to an individual who [is merely regarded as disabled]." 42 U.S.C. § 12201(h).[3]

The Court finds this approach well grounded in logic. The purpose of a reasonable accommodation is to assist the disabled employee, not to make an employer own up to its subjective beliefs. As such, it goes against logic to make an employer provide an accommodation to an employee who would not otherwise qualify for it just because the employer was mistaken as to the employee's condition. To do so would potentially require employers to divert resources away from those truly disabled under the Act, thereby running the risk that employers might inadequately accommodate those who are actually disabled. Consequently, the Court finds that Mr. Bateman was not entitled to a reasonable

accommodation even if American regarded him as disabled.

### 4. Title VII Race Discrimination

The Court denies American's motion for summary judgment as to Mr. Bateman's Title VII race discrimination claim because there is a genuine issue for trial as to whether Mr. Bateman was subjected to disparate treatment where white American employees were provided the no-flying accommodation denied Mr. Bateman. To establish a Title VII race discrimination claim, a plaintiff must first prove a prima facie case of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the plaintiff is successful in making a prima facie case, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action. *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097; *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Once the defendant "produces sufficient evidence to support a nondiscriminatory explanation for its decision," the burden then shifts back to the plaintiff to show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097 (internal citations omitted).

Disparate treatment occurs "when an employer treats certain people less favorably than others on the basis of a protected classification, such as race." *Carter v. Ball,* 33 F.3d 450, 456 n. 7 (4th

---

**3.** Although the 2008 Amendments are not controlling, the Court finds them instructive in determining which approach to adopt on the issue of reasonable accommodation for regarded disability.

Cir.1994) (internal citations omitted). In order to show a prima facie case of disparate treatment under Title VII, a plaintiff must show that: 1) he is a member of a protected class; 2) he has satisfactory job performance; 3) he was subjected to an adverse employment action; and 4) similarly-situated employees outside his class received more favorable treatment. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *Cottman v. Rubin*, 35 Fed.Appx. 53, 55 (4th Cir.2002).

### a. Prima facie case—similarly-situated comparator

The Court holds that Mr. Bateman has made out a prima facie case of disparate treatment. Mr. Bateman points to two forms of disparate treatment in stating his Title VII claim. First, he argues that he was subject to disparate treatment when denied accommodation because American afforded some form of light duty accommodation and/or no-flying status to several white flight attendants and a white flight service manager. Second, he argues that he was subject to disparate treatment when American fired him but retained Ms. Turner, a white female.

The first three elements of a prima facie case are not in dispute. As to the fourth element, American argues that the flight attendants are not similarly situated because Mr. Bateman was their manager and therefore they were performing entirely distinct jobs. American further claims that Flight Service Manager Ms. Kathy Potts, a white female, is not similarly situated because a purser flight service manager has additional duties for which a flight service manager is not responsible.[4]

■ The Court rejects American's arguments because American's approach draws unnecessary distinctions based strictly on job titles and ignores the fundamental inquiry—relevance—in determining who is and is not similarly situated. In evaluating similarly-situated comparators, employees are similarly situated if they are similar in all relevant respects. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997). *See also Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir.1994); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992); *Smith v. Monsanto Chem. Co.*, 770 F.2d 719, 723 (8th Cir.1985).

■ Here, the relevant respects include job function, accommodation requested, and the overall effect those accommodations have on job performance. American argues that flight attendants are not similarly situated, but also argues that flying is an essential element of Mr. Bateman's job. In both instances, American required the parties to be able to fly as part of their jobs. In both instances, the parties sought to be excused from flying. The parties are similar in all relevant respects because what is relevant here is the inability to fly while performing a job that requires flying. Despite the similarity, American granted this accommodation to white flight attendants, yet denied it to Mr. Bateman. This is particularly telling because flying is *the* essential function of flight attendants. As such, the Court finds that the white flight attendants are similarly-situated comparators.

■ The Court also finds that Ms. Potts is similarly situated for purposes of determining disparate treatment in the denial of a light duty accommodation. American argues that Ms. Potts is not similarly situated because she holds a different job title than Mr. Bateman. There is no requirement that a similarly-situated compa-

---

4. American did not address Mr. Bateman's ability to establish a prima facie case of disparate treatment as to its retention of Ms. Turner so the Court does not address it here.

rator hold a plaintiff's identical position. Such a requirement would make it virtually impossible for an employee to make out a prima facie case, especially in cases like this where Mr. Bateman was the only purser flight service manager in the area until American hired Ms. Turner to replace him. The key inquiry is whether the positions are similar in the respects that are relevant to the alleged disparate treatment. Here, American relies on the fact that Ms. Potts and Mr. Bateman hold different positions, but American points to nothing that makes this difference relevant to the denial of Mr. Bateman's request for light duty accommodation. Mr. Bateman's position encompasses that of Ms. Potts's and is therefore largely similar; differences matter only to the extent that they are relevant to the question of accommodation. As such, the Court finds Ms. Potts similarly situated for purposes of the denial of Mr. Bateman's request for light duty accommodation.

### b.  Pretext

American further argues that, even if Mr. Bateman can make out a prima facie case of disparate treatment, the Court should grant summary judgment: 1) as to Title VII accommodation because Mr. Bateman cannot show that American's reasons for denying his no flying accommodation were pretextual; and 2) as to Title VII discharge because he cannot show that the RIF was a pretext for discriminatory discharge.

Here, there is ample evidence creating a genuine issue for trial as to whether the denial of an accommodation was pretextual. First, as mentioned above, American denied Mr. Bateman no flying status yet granted it to white flight attendants whose primary duty was to fly. American argues that flying was an essential function of Mr. Bateman's job, but Mr.

Bateman rarely flew. He was only required to fly once a quarter. (Bateman Dep. 40–41.) In addition, only twice did he fly on an emergency basis. (*Id.* at 47–48.) Furthermore, despite his eighteen consecutive years of perfect attendance on the job, Mr. Bateman only substituted for a flight attendant five times in his entire career. (*Id.* at 52.) Second, it is curious that American would hire Mr. Bateman as a purser flight service manager if flying was an essential function of the job when Mr. Bateman fails to meet the published flight attendant physical requirements. Flight attendants must be no more than six feet tall, yet Mr. Bateman is six feet, four inches. (Bateman Aff. ¶ 3; Pl. Opp. Ex. 6.) It is highly unlikely that American would hire him for the position if flying was in fact essential when he fails to meet the position's requirements. There is a genuine issue as to whether flying was so essential to the position that it was American's true basis for denying his no-flight request. As such, the Court finds sufficient evidence of pretext for the case to proceed to trial.

As to pretext in American's discharge of Mr. Bateman, for the reasons stated in Section 5(b), below, the Court finds that a genuine issue for trial exists as to whether the RIF was a pretext for discriminatory discharge. As a result, American's motion for summary judgment as to Mr. Bateman's Title VII discrimination claim is denied.

### 5.  Retaliation—Title VII and ADA

The Court also denies American's motion for summary judgment as to Mr. Bateman's Title VII and ADA retaliation claims because Mr. Bateman can establish a prima facie case of retaliation and because there is a genuine issue for trial as to whether American's RIF was a pretext for retaliatory action. Title VII and ADA

retaliation claims are evaluated under the burden shifting rules established by the Supreme Court in *McDonnell Douglas Corp.*, 411 U.S. 792, 93 S.Ct. 1817.

First, in order to state a prima facie case of Title VII or ADA retaliation, a plaintiff must show: 1) that he engaged in a protected activity; 2) that he suffered an adverse employment action at the hands of his employer; and 3) that a causal connection existed between the protected activity and the adverse action. *Rhoads*, 257 F.3d at 392; *Bryant*, 333 F.3d at 544; *EEOC v. Reynolds Metals Co.*, 212 F.Supp.2d at 536.

Once a plaintiff establishes a prima facie case, "[t]he employer then has the burden to rebut the presumption of retaliation by articulating a legitimate, non-discriminatory reason for its actions." *Rhoads*, 257 F.3d at 392. If the employer does so, the plaintiff must demonstrate that the proffered reason is a pretext for forbidden retaliation. *Id.*

#### a. Prima facie case

Here, the first two elements of a prima facie retaliation case are not in dispute. American argues, however, that Mr. Bateman cannot establish the third element because more than eight months elapsed between the time when Mr. Bateman filed the 2005 Charge and his discharge in January 2006. As a general rule, a causal connection may be established by showing that a defendant had knowledge of the protected activity and that the adverse action was "very close" in time to the protected activity. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272–73, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). As temporal proximity fades, the inference of a causal connection weakens. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998) ("A lengthy time lapse ... negates any inference that a causal connection exists.").

However, American misses the mark here because, although temporal proximity between an employer's knowledge of protected activity and its adverse action is instructive, longer periods do not necessarily defeat the causation element of a retaliation claim. *See Lettieri v. Equant, Inc.*, 478 F.3d 640 (4th Cir.2007) (causation element satisfied where seven-month intervening period was filled with employer's continuing retaliatory conduct and animus); *Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205 (10th Cir.2003) (close proximity where employee filed a complaint, went on five-month medical leave, and was fired seven days after her return to work); *Richardson v. New York Dep't of Corr. Serv.*, 180 F.3d 426 (2d Cir.1999) (causation established where employee filed discrimination claim while on leave, then was transferred to a different location when she returned to work eight months later).

American's position that the eight-month gap between Mr. Bateman's 2005 EEOC Complaint and his discharge defeats his retaliation claims is unavailing, particularly on these facts. As fittingly noted by one court,

> The reason that a five-month gap generally does not in itself suffice to establish causation is that anger or resentment—the motivation for possible retaliation—is an emotion that tends to diminish with time. When retaliation for an act occurs well after the act, one wonders why the retaliator failed to act sooner. In this case, however, Plaintiff was on leave during most of the time between her filing the ... complaint and grievance, and her transfer and reassignment.... We think a jury could reasonably draw a retaliatory inference based on the timing of these events.

*Wells*, 325 F.3d at 1217. Here, viewing the facts in the light most favorable to Mr.

Bateman, an eighteen year employee with perfect attendance until his work related injury, he returned to work with limited temporary restrictions and American fired him just four days after he returned from an involuntary leave of absence. (Pl. Opp. Ex. 19.) Although Mr. Bateman filed his 2005 Charge in January 2005, it was not until his return to work in January 2006 that American had the opportunity to fire him. Mr. Powell doubted that Mr. Bateman would even return to work until Mr. Bateman told him of his intention to return in December 2005. American's motive for retaliation might have dissipated when it suspected that Mr. Bateman would not return, but once it became clear that he planned to go back to work a jury could reasonably infer that American's retaliatory motive reemerged and that his discharge was a product of it.

### b. Pretext

American argues that, because it identified its RIF as the nondiscriminatory reason for Mr. Bateman's discharge, the burden shifts back to Mr. Bateman, who cannot show that the RIF was a pretext for retaliation. This Court disagrees for four reasons.

■ First, American has provided no written documentation that the RIF was a pre-planned, deliberate action.[5] In *John-son v. VeriSign, Inc.*, this Court made clear that it casts a wary eye on undocumented RIFs. No. Civ.A.01–765–A, 2002 WL 1887527 (E.D.Va. Aug. 15, 2002). In that case, this Court granted Mr. Johnson a new trial on his retaliatory discharge claim because it discovered that VeriSign was misleading about the nature of its RIF. *Id.* There, VeriSign argued that it discharged Mr. Johnson as a part of its RIF, intimating that his name was among a list of employees identified and approved for discharge. *Id.* at *4–5. When ordered to produce the list, however, VeriSign "did not provide a single document identifying any of the VeriSign employees who were laid off...." *Id.* at *6. Further, although seven employees were laid off from Mr. Johnson's department, Mr. Johnson was the only one discharged from his office. *Id.* at *9. This Court found that the lack of tangible documentation indicating that the discharge was part of a reasoned, deliberate plan shed doubt on VeriSign's non-pretextual rationale for discharging Mr. Johnson. *See id.* at *16.

The Court finds the lack of documentation troubling in this case as well. Here, American argues that Mr. Bateman was discharged as part of a RIF, yet it produced no documents from management or higher headquarters, not even a single email or memorandum, announcing the RIF or the way in which it would be

---

**5.** American produced two onboard service department manning charts in response to the Court's order to produce documentation showing that the RIF was directed by management. The Court finds these charts wholly lacking as proof of a RIF for three reasons. First, the term "RIF" is mentioned nowhere in either chart. It stands to reason that a chart created in preparation for a RIF would state as much. Second, there is no indication as to who prepared the documents or why they were prepared. The Court cannot tell if they were created in preparation for a RIF, in preparation for a visit from higher headquarters, or in preparation for floorplan renova-tions. American asks the Court to assume that the charts are for RIF purposes but the Court can make no such assumption without supporting, contemporaneous documentation that provides the proper context. Third, the charts are not directives. The Court requested documentation showing that the RIF was directed by management; the charts submitted make bare references to "5% Targets." "Target" is a word of suggestion; it connotes an aspirational goal, not a mandatory end result. The charts lack language of direction and therefore cannot be read as demanding a RIF.

accomplished. In fact, the only evidence American offers regarding the RIF is the deposition testimony of Mr. Powell and Mr. Tiliacos, two low-level managers who do not appear to have the authority to make such decisions without specific guidance and directives from American. This lack of RIF-related documentation calls American's non-pretextual reasoning into question.

Second, the record shows blaring discrepancies as to when and why American first considered terminating Mr. Bateman as part of the RIF. Discussion of a RIF began sometime around August or September 2005. (Powell Dep. 30.) However, Mr. Powell and Mr. Tiliacos offered conflicting testimony as to when American began considering Mr. Bateman as a candidate for discharge. Mr. Powell stated that Mr. Bateman was not considered until December 2005, when Mr. Bateman expressed his intent to return to work. (Powell Dep. 34.) Mr. Tiliacos, however, indicated that he and Mr. Powell discussed Mr. Bateman as a candidate "somewhere in the vicinity of discussions surrounding headcount reductions in the fall of 2005." (Tiliacos Dep. 23:2–5.) These conflicting time frames cast further doubt upon American's non-pretextual reason for Mr. Bateman's discharge.

Third, the number of employees discharged as part of the RIF is also disturbing. Mr. Bateman was the only employee in the Washington, D.C., area discharged because of the RIF, despite a five percent reduction goal company wide. (Powell Dep. 66.) Of the 478 employees within the onboard services department, only 3 were laid off as part of the RIF. (Tiliacos Dep. 13–14; Pl. Opp. Ex. 20.) Viewing the facts in the light most favorable to Mr. Bateman, it is suspicious that he was the only person in the area affected by the RIF.

Fourth, the manner in which Mr. Powell chose Mr. Bateman for discharge instead of Ms. Turner raises a genuine issue for trial. Mr. Powell indicated that he used only the 2003 evaluations in making the decision, despite the fact that Ms. Turner held a different and less complex position at the time of her 2003 evaluation. In addition, Mr. Powell chose not to consult either Mr. Bateman's former supervisors or subordinates for feedback on Mr. Bateman's performance, even though Mr. Powell had no personal experience supervising Mr. Bateman. Also, it does not appear to this Court that Mr. Powell evaluated the two employees using the four criticality factors as required by American's written policies on the subject. Mr. Powell's process in evaluating Mr. Bateman and Ms. Turner raises questions about the validity of the selection process.

These facts, when considered together, create a genuine issue for trial as to whether the RIF was a pretext for American's retaliatory termination of Mr. Bateman. As such, the Court denies American's motion for summary judgment as to Mr. Bateman's Title VII and ADA retaliation claims.

### III. CONCLUSION

The Court grants summary judgment in favor of Defendant on Plaintiff's wrongful discharge and failure to accommodate claims, but denies summary judgment on Plaintiff's race discrimination and retaliation claims. The Court holds that Plaintiff properly exhausted his administrative remedies as to his discriminatory discharge claims when he filed his 2006 EEOC retaliation complaint. Although his 2006 Complaint specifically alleged only retaliation, a reasonable investigation conducted by the EEOC would naturally lead it to uncover the underlying protected activity, the 2005 EEOC discrimination complaint, which ex-

pressly alleged both race and disability discrimination. The Court holds that Plaintiff's ADA wrongful discharge claim fails because Plaintiff's temporary impairment did not render him actually disabled under the ADA and the *Toyota* analysis. The Court holds that Plaintiff also cannot show that Defendant wrongfully terminated him because it regarded him as disabled because Defendant did not regard him as being unable to perform a broad range of jobs *at the time of his discharge.* In addition, the Court holds that Plaintiff's failure to accommodate claim fails because Plaintiff was not actually disabled and, even if regarded as disabled, being regarded as disabled would not entitle him to a reasonable accommodation. Furthermore, the Court holds that a genuine issue for trial exists as to Plaintiff's Title VII disparate treatment claim because a similarly-situated comparator may be similar to Plaintiff in all relevant respects despite having a different job title. The Court also holds that Plaintiff can establish the causal element of his retaliation claim despite an eight-month gap in time because a genuine issue for trial exists as to whether Defendant's retaliatory motive remained dormant while Plaintiff was on leave but reemerged once he returned to work. Finally, the Court holds that Plaintiff may be able to establish pretext as to his retaliation claims because there is a genuine issue for trial as to whether Defendant's isolated, undocumented RIF was simply a pretext for retaliatory discharge. Therefore, for the foregoing reasons it is hereby

ORDERED that Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part. It is further

ORDERED that the Motion is GRANTED as to Plaintiff's ADA wrongful termination and failure to accommodate claims. It is further

ORDERED that the Motion is DENIED as to Plaintiff's Title VII race discrimination, Title VII retaliation, and ADA retaliation claims.

The Clerk is directed to forward a copy of this Order to counsel.